# NO. 12-13-00033-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *LARRY JOE SMITH,*<br>*APPELLANT* | *§* | *APPEAL FROM THE 114TH* |
| *V.* | *§* | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | *§* | *SMITH COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Larry Joe Smith appeals his conviction for murder. In two issues, Appellant challenges the sufficiency of the evidence and the imposition of court costs. We affirm.

### BACKGROUND

Appellant is the ex-husband of Ms. Sandra Greenhaw, who he shot and killed on the evening of March 16, 2012. A Smith County grand jury indicted Appellant for the offense of murder. Appellant pleaded "not guilty" to the charge and claimed self-defense.

A jury found Appellant guilty of murder and assessed his punishment at imprisonment for forty-two years. This appeal followed.

### SUFFICIENCY OF THE EVIDENCE

In his first issue, Appellant contends that the evidence "is legally insufficient to support the jury's rejection of self-defense." Specifically, he argues that the record establishes that he was acting to defend himself, his home, and his property when he shot Greenhaw.

#### Standard of Review

The issue of self-defense is a fact issue to be determined by the jury, and a jury's verdict of guilt is an implicit finding that it rejected a defendant's self-defense theory. *Saxton v. State*, 804

S.W.2d 910, 913–14 (Tex. Crim. App. 1991) (en banc). In reviewing the sufficiency of the evidence to support the jury's rejection of self-defense, we examine all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact would have found the essential elements of the offense and also would have found against the defendant on the self-defense issue beyond a reasonable doubt. *Id.* at 914 (stating "we look not to whether the [s]tate presented evidence which refuted appellant's self-defense"); *Sutton v. State*, No. 12-04-00150-CR, 2005 WL 3725087, at *3 (Tex. App.—Tyler 2006, pet. ref'd) (mem. op., not designated for publication).

## Applicable Law

The use of deadly force is justified as self-defense under certain circumstances. *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011). An actor is justified in using deadly force against another if (1) the actor would be justified in using force under Section 9.31 of the penal code, and (2) when and to the degree the actor reasonably believes that deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force, or to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. *See* TEX. PENAL CODE ANN. § 9.32(a) (West 2011).

When a defendant raises self-defense, he bears the burden of producing some evidence to support his defense. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2005) (citing *Saxton*, 804 S.W.2d at 913–14); *see also McCurdy v. State*, No. 06-12-00206-CR, 2013 WL 5433478, at *3 (Tex. App.—Texarkana Sept. 26, 2013, pet. ref'd) (mem. op., not designated for publication). Once the defendant produces some evidence supporting his defense, the state then bears the burden of persuasion to "disprove the raised defense." *Zuliani*, 97 S.W.3d at 594; *see also Tidmore v. State*, 976 S.W.2d 724, 729 (Tex. App.—Tyler 1998, pet. ref'd) (state does not have burden of producing evidence to affirmatively refute self-defense). The burden of persuasion does not require the production of evidence; it requires only that the state prove its case beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594. Moreover, "[d]efensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the [s]tate's evidence insufficient since the credibility determination of such evidence is solely within the jury's province[,] and the jury is free to accept or reject the defensive evidence." *Saxton*, 804 S.W.2d at 914.

2

**The Evidence**

The evidence is undisputed that Appellant shot and killed Sandra Greenhaw. At approximately 11:23 p.m. on March 16, 2012, Appellant called 911 to report that he had shot an individual who had attempted to break into his house. Appellant told the dispatcher he did not know the individual and that "he" was lying on the front porch. He explained that he was watching television "and somebody broke through the window." The dispatcher asked Appellant, "Did they break your window?" Appellant responded, "Yes[,]" and further stated, "I shot through the window."

The first three law enforcement officers who arrived at Appellant's residence were Smith County patrol deputies Bryce Hatton and Matthew Christian and patrol sergeant Jim Johnson. Each testified that when they arrived, they saw Greenhaw lying on her back outside Appellant's residence. Deputy Hatton testified that it sounded as if Greenhaw was trying to breathe and that she was lying "closer towards the house" along the concrete slab near the house, with her head positioned toward the door of the residence and her feet positioned "away from the door."

The record showed that Greenhaw was wearing a blue shirt and blue jeans, but no shoes. Despite the fact that she was not wearing any shoes, several law enforcement officers testified that the bottom of Greenhaw's feet were clean.

The record showed that when Sergeant Johnson checked Greenhaw's pulse, it was "very faint." By the time paramedics arrived, Greenhaw had agonal respirations, her heart was not beating, and she no longer had a pulse. Greenhaw officially was pronounced dead at 12:34 a.m. on March 17, 2012.

*Appellant's Explanations*

Deputy Hatton testified that when he was dispatched to Appellant's residence, "the subject had called in, and [reported] somebody had broke out his window and he had shot him." As he escorted Appellant to a patrol car, Appellant said, "I shot them. They're dead." Deputy Christian testified that Appellant explained that he was sitting in his recliner when he observed a male subject break his window. Christian elaborated as follows:

> [W]henever [Appellant] said that he had seen somebody breaking into his residence, he shot them inside the residence. And then he said that—when I asked him how the body was still outside, and then [Appellant] said he doesn't know.

3

When asked whether Appellant seemed confused about whom he had shot, Christian testified that Appellant "kept wanting to see—or he kept asking me if he could see the body. He wanted to know who it was."

Smith County Sheriff's Office detective Kevin Fite testified that Appellant never changed his position that he shot someone who was coming through the window. However, Detective Fite further testified that his observations of the scene were not consistent with Appellant's account. And despite Appellant's assertions to Deputy Christian that he wanted to know who he had shot, Detective Fite testified that the patrol car's camera recorded Appellant's saying "didn't kill Sandra."[1] According to Detective Fite, Appellant made this statement before Greenhaw had been identified.

Detective Fite and Detective Dana interviewed Appellant on the night of the shooting. A recording of the interview was played at trial. In the beginning of the interview, Appellant told the detectives that he had not fired a weapon within the past twenty-four hours. Appellant also told the detectives that he did not know why there were so many law enforcement officers at his house that night. During the last fifteen minutes of the interview, Appellant asked, "What do y'all think I have done?" He later stated, "If I hadn't done nothing, let me out of here," and "I don't know what I did[.] I don't know what y'all are talking about."

On March 20, 2012, Detective Fite and Detective James Riggle interviewed Appellant. The audio recording of this interview also was played at trial. In the interview, Appellant told the detectives that he called 911 on the night of the shooting because he did not know where Greenhaw was. He explained that he remembered Greenhaw's coming to his house and their "[getting] drunk," but he did not remember shooting her. Appellant remembered law enforcement officers telling him to put down his gun, but could not remember ever picking up the gun. He stated, "I remember shooting through the window[;] I thought someone [was] trying to come in through the window." Appellant told the detectives, "I feel bad about this," and called himself a "stupid [] drunk."

*Appellant's Residence*

The record reflects that there was no broken glass at Appellant's residence. The window through which Appellant claimed the alleged burglar attempted to enter was raised, and its screen

---

[1] The record indicates that when Appellant made this statement, he was talking to himself and was not being questioned.

4

was lying outside in a grassy area several feet away. Greenhaw's gold Saturn was parked near Appellant's residence and was cold to the touch.[2]

The evidence further showed that law enforcement officers found Greenhaw lying in a pool of blood along a wet concrete pathway leading to the door of the residence. Detective Justin Hall testified that there was "a lot of water" near Greenhaw, and that the wetness on the concrete had not been caused by rain.

Detective Noel Martin, a criminalist for the Smith County Sheriff's Office, could not determine with certainty that the wetness on the concrete was caused by water, but he ruled out the possibility of its being a blood stain, and testified that a water hose was found nearby. Detective Martin looked for blood "all over" the exterior of Appellant's residence from the door to the corner of the home, and testified that he looked also for scuff marks and other marks that would have indicated an attempted entry through the window. He found no such marks. Detective Martin further testified that he sprayed "BlueStar" on the outside of the house and window to detect any blood that could not be seen with the naked eye, but no blood was detected on the exterior of Appellant's residence.[3]

The State introduced several photographs of Appellant's residence at trial. Among these exhibits was a photograph of a spent shotgun shell that was found between the seat cushion and arm of a recliner inside Appellant's living room. Another photographic exhibit was introduced that showed a portion of Appellant's living room where a pair of women's sandals were on the floor and a recliner and rocking chair were positioned next to a table that contained several items.[4] The items on the table included a bottle of vodka, a two liter bottle of Coke, a beer can, cigarettes, an ashtray, and Greenhaw's car keys. Ultimately, the evidence showed that the sandals belonged to Greenhaw, the Coke bottle had Greenhaw's fingerprints, and the beer can and some of the cigarettes contained Greenhaw's DNA.

The record reflects that no large amounts of blood were found inside Appellant's residence. Detective Martin testified that any blood located was confined to the area to the left of the front window, to the wall, to a towel hanging on a rack located to the left of the window, and

---

[2] Appellant's neighbor, Holly Shaw, testified that she saw Greenhaw drive to Appellant's residence in the gold Saturn several hours before the shooting.

[3] Bluestar is a chemical that fluoresces when it comes into contact with blood.

[4] This photograph was admitted into evidence as State's Exhibit 101.

to the inside of the window frame. He explained that not all of the blood was visible to the naked eye. And the record reflects that blood and subcuatneous tissue was found in the left bottom corner of the window sill, and a blue fiber from Greenhaw's shirt was found inside the window frame.

The State admitted photographs showing the Bluestar reaction to blood found near the windowsill and window frame. Detective Martin testified that the Bluestar showed a "fine-misting pattern" of blood. He explained that this was consistent with a gunshot wound because the bullet produces a mist when it hits the blood source. Detective Martin testified that this pattern is known as "back spatter[,]" which is the projected blood produced when a gunshot hits a blood source. He explained that blood is expelled from the wound back to the source or the energy of the gun, is "misty" in nature, and forms a conical shape.

Detective Martin testified that the pattern of the blood spatter indicated that the blood source was "somewhere level with [the] windowsill or slightly below it" and the shooter was standing above the blood source. Although Detective Martin could not determine exactly how Greenhaw was positioned when she was shot, he explained that she was inside Appellant's residence, located to the left of the window, and positioned "low."

Detective Martin stated that the trajectory of the blood spatter and Greenhaw's wound negated the possibility that Appellant was sitting in the recliner or the rocking chair when he shot Greenhaw. He further stated that the pattern of the blood spatter and the absence of blood drops and blood stains on the window sill also negated the possibility that Greenhaw was leaning over the window sill from the outside when she was shot. The pattern of the blood spatter, according to Detective Martin, was inconsistent with the theory that Greenhaw was outside the residence when Appellant shot her because, in that case, blood spatter would have been on the outside of the building.

The record reflects that there were no transfer stains or blood trails inside or outside of Appellant's residence. There was also no evidence that indicated Greenhaw was dragged from inside the residence to where she was found by the officers. Detective Martin stated that it was possible that Greenhaw was wrapped in something to prevent any blood from dripping and moved outside of the residence.

The record also reflects that the officers never found any bloody sleeping bags or other materials that they suspected were used to move Greenhaw. Nevertheless, Detective Martin

6

testified that he was not surprised to see a lack of blood stains inside the residence because staining depends on how the body falls. He explained that it is "not uncommon to not find blood trails associated with [the] victim's moving due to the fact that [the victim] bleed[s] internally." Detective Martin characterized the amount of blood at Appellant's residence as "very small" because Greenhaw bled internally.

### Greenhaw's Cause of Death

Dr. Tracy Dyer, a medical examiner and forensic pathologist for the Southwestern Institute of Forensic Pathology, testified that Greenhaw's death was caused by a gunshot wound. She further testified that the plastic wadding from the shotgun shell was found inside Greenhaw's liver and metal pellets referred to throughout trial as "birdshot" also were found inside her body. Dr. Dyer stated that Greenhaw's wound showed that the trajectory of the gunshot was "downward[,] front-to-back[,] and right-to-left." She further stated that because the plastic wadding from the shotgun shell was inside Greenhaw's liver, Greenhaw was shot from a range of three to five feet.

Dr. Dyer testified that, with gunshot wounds, "you can never tell exactly where the blood loss is going to occur." She explained that while there would be blood loss around the edges of the wound, if there is no exit wound, much of the bleeding can be retained internally. When asked specifically about whether Greenhaw's wound would have caused a lot of blood loss, Dr. Dyer testified that she could not tell, noting that "if she was l[y]ing flat on her back, there may not have been a lot." She explained further that the amount of blood loss might not be "as much as you might think if the person kind of ends up on [her] back and that wound is never sort of turned so that gravity pours the blood out."

### Appellant's Theory

Louis L. Akin, crime scene expert for the defense, disagreed with Detective Martin's theory that Greenhaw had been in a low position inside Appellant's residence when she was shot. He proposed that the absence of blood evidence inside the residence and the large pool of blood outside showed that Greenhaw was not moved. Akin explained that his theory was supported by the fact that the blood stains on Greenhaw's clothing were concentrated in one area and her torso and other clothing were clean. He noted that had she been moved, the blood flow pattern on Greenhaw's body would have been different. He also stated that, had Greenhaw "stood [up]" after being shot, the blood staining would have been more profuse, her "blouse would have been soaked, and it would have been soaked all the way down her pants."

7

Akin testified that he believed Greenhaw was climbing through the window and was partially inside the residence when she was shot. He explained that "[s]hotguns make a mess," which results in "actual tissue that's blown all over the place." Thus, according to Akin, if Greenhaw was crouched down inside the residence, it would be highly unlikely that tissue would be found on the towel hanging next to the window. Instead, Akin submitted that it made more sense for the subcutaneous tissue to be found on the towel if Greenhaw were leaning in the window as she was attempting to enter the residence.

### *Evidence Rebutting Appellant's Theory*

Detective Martin testified that Akin's theory was not supported by the evidence found at Appellant's residence. Specifically, he referred to a blood stain shown in a previously admitted photograph. Detective Martin explained that the upward trajectory of the blood stain demonstrated that the blood source was "below the window, right even with the windowsill." Detective Martin testified that, under Akin's theory, no such blood stain would have been possible.

Detective Martin also testified that, if Akin's theory were correct, he would expect to see (1) blood on the windowsill in the form of a large transfer stain from the wound as it dragged across the windowsill, (2) transfer stains on the outside of the windowsill, (3) blood on the floor inside the residence, (4) blood dripping down the wall, and (5) transfer stains where Greenhaw fell.

Detective Martin conceded that the lack of blood inside the residence was concerning. He testified that he had no explanation for its absence, stating "[t]here could have been something covering the floor there that was removed" and "there's all kinds of variables and possible scenarios, but we can speculate all day long."

In addition to the crime scene evidence, the State elicited testimony from other witnesses that tended to negate Appellant's claim of self-defense. Appellant's neighbor, Holly Shaw, testified that Appellant had a history of getting very intoxicated. And the record reflects that several hours after the shooting, Appellant had a blood alcohol concentration of 0.165, which is greater than twice the legal definition for intoxication.

Appellant's son testified that he and Appellant had a disagreement in 2006, during which Appellant, who was intoxicated, pointed a gun in his direction. Gerald Whittington, an acquaintance of Appellant's, testified that during a period of approximately two years, Appellant

8

would come to his house intoxicated. Whittington stated that he repeatedly asked Appellant not to come to his house, but "it didn't do much good." He further stated that Appellant came to his house several times in one day during 2007 despite Whittington's warning him not to come back again. But when Appellant did come back to Whittington's house, Whittington punched him, and Appellant "pulled a gun" and "shot into the ground" in front of Whittington, telling him that "he would kill [him]."

Sammy Jaynes, one of Greenhaw's ex-husbands and Appellant's longtime friend, testified that he had known Appellant for forty years.[5] He further testified that he talked to Appellant about having seen Greenhaw with "a swelled up nose[.]" According to Jaynes, Appellant responded, "I wish I had killed the b----." Jaynes stated that Appellant made this statement within the last ten years. He stated that Appellant would talk "like that" every time he "got drunk[,]" and explained that Appellant angers easily when he drinks.

Brittany Jaynes, Appellant's and Greenhaw's granddaughter, lived with Appellant and Greenhaw from 2000 through 2005. Brittany testified that during that time, she saw Appellant punch, grab, throw, slap, and do "stuff like that" to Greenhaw. She also testified that Appellant described Sammy Jaynes as a "s----- person," and stated, "If I could get away with shooting him and your—Sandra Kay both, if I could get away with shooting both of them, I would do it."

The record reflects that approximately two weeks before the shooting, Brittany's then boyfriend, Michael, was visiting Brittany at Sammy Jaynes's house when he saw Appellant. Michael testified that at the time, Appellant made the statement that "if there was any way that he could possibly get away with murdering [Greenhaw] or Sammy Jaynes that he would do it." Michael explained that he did not take Appellant's threat seriously because he thought Appellant was "just drunk," but told Greenhaw about it the next evening nonetheless.

Norma Smith, Appellant's most recent ex-wife, testified that Appellant "pulled a gun" on her "years ago, in 1969," or later than that. She related that Appellant slapped her "a few times" during their marriage, and that he gave her two black eyes after she obtained a restraining order against him after their divorce. Her testimony also revealed that Appellant was known to verbalize threats to do certain things and was usually drinking when he would "scatter the crowd with his gun, I think." However, Smith testified that prior to this occasion, Appellant had never

---

[5] Sammy Jaynes was married to Greenhaw before she married Appellant.

shot anyone. She explained, "I don't think [Appellant's] intent was ever to shoot anybody. I remember thinking he might [do so] accidentally."

**Discussion**

To accept Appellant's claim of self-defense, the jury would have had to have found that (1) he was justified under Section 9.31 of the penal code in using deadly force against Greenhaw and (2) reasonably believed the deadly force was immediately necessary to protect himself against Greenhaw's use or attempted use of unlawful deadly force or Greenhaw's imminent commission of a crime. *See* TEX. PENAL CODE ANN. § 9.32(a). Appellant's belief that deadly force was immediately necessary is presumed to be reasonable if Appellant knew or had reason to believe that Greenhaw unlawfully and with force entered, or was attempting to enter, Appellant's occupied habitation. *See id.* § 9.32(b)(1)(A).

Appellant's 911 phone call is evidence that he believed someone was attempting to unlawfully enter his residence. *See id.* § 9.32(b)(1)(A). Appellant's expert witness's testimony provided further support for Appellant's belief that Greenhaw was attempting to enter his residence. His expert testimony concerning (1) the absence of blood evidence inside Appellant's residence, (2) the concentration of blood stains being in one area of Greenhaw's clothing, and (3) the existence of subcutaneous tissue on the towel made it more likely that Greenhaw was shot as she was coming through the window and was not later moved outside. But the weight given to contradictory testimonial evidence is within the sole province of the jury because it turns on an evaluation of credibility and demeanor. *See **Cain v. State***, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997) (en banc).

To the contrary, the State's expert witness testified that the pattern of blood spatter indicated that Greenhaw was inside the residence when she was shot. This evidence, when viewed in light of Appellant's intoxication, his history of violence, his animosity toward Greenhaw, his inconsistent accounts of what transpired that evening, and the fact that Greenhaw had been drinking with Appellant that night permitted the jury to rationally conclude that it was not reasonable for Appellant to believe that deadly force was immediately necessary because Greenhaw did not unlawfully enter or attempt to unlawfully enter Appellant's habitation with force. *See* TEX. PENAL CODE ANN. § 9.32(a)(2), (b)(1)(A); ***Saxton***, 804 S.W.2d at 914.

After viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found the essential elements of the offense and also could have found

against Appellant on the self-defense issue beyond a reasonable doubt. *See id.* Therefore, we hold that the evidence is sufficient to support the jury's implicit rejection of Appellant's self-defense claim. *See id.* We overrule Appellant's first issue.

### IMPOSITION OF COURT COSTS

In his second issue, Appellant contends that the trial court erred by imposing court costs and ordering that they be withdrawn from his inmate trust account without a bill of costs.

### Standard of Review and Applicable Law

The imposition of court costs upon a criminal defendant is a "nonpunitive recoupment of the costs of judicial resources expended in connection with the trial of the case." ***Johnson v. State***, 423 S.W.3d 385, 390 (Tex. Crim. App. 2014). When the imposition of court costs is challenged on appeal, we review the assessment of costs to determine if there is a basis for the costs, not to determine if there is sufficient evidence offered at trial to prove each cost. *Id.*

A bill of costs is not required to sustain statutorily authorized and assessed court costs, but it is the most expedient and, therefore, preferable method. *See id.* at 396. If a bill of costs is omitted, one can be prepared and presented to the appellate court in a supplemental clerk's record. *See id.* at 392.

### Discussion

After Appellant filed his brief, the record was supplemented with a bill of costs. *See id.* The amount reflected in the bill of costs corresponds with the costs reflected in the judgment. Appellant does not challenge a specific cost or basis for the assessment of a particular cost. Absent such a challenge, the bill of costs of record is sufficient to support the assessed costs in this case. *See id.* at 396. We overrule Appellant's second issue.

### DISPOSITION

Having overruled Appellant's first and second issues, we ***affirm*** the judgment of the trial court.

JAMES T. WORTHEN
Chief Justice

Opinion delivered December 17, 2014.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(DO NOT PUBLISH)

11



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**DECEMBER 17, 2014**

**NO. 12-13-00033-CR**

**LARRY JOE SMITH,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 114th District Court

of Smith County, Texas (Tr.Ct.No. 114-0770-12)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*